**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ALAN TROY RUYBAL,

      Plaintiff,

v.                                               CV 14-33 WPL

CAROLYN W. COLVIN, *Acting*
*Commissioner of the Social Security*
*Administration*,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

Alan Ruybal filed an application for Disability Insurance Benefits on March 14, 2007. (Administrative Record ("AR") 13.) He alleges disability beginning on December 8, 2006, due to diabetes; back, leg, and foot pain; and depression. (AR 299.) Administrative Law Judge ("ALJ") Ann Farris held a disability hearing on December 18, 2009. (AR 58-85.) On February 11, 2010, the ALJ issued a partially favorable decision, determining that Ruybal was not under a disability as defined by the Social Security Act prior to May 19, 2009, but that he was disabled beginning on that date and continued to be disabled through the date of decision. (AR 105-06.) Ruybal filed an appeal with the Appeals Council, and on August 14, 2012, the Council granted remand to the ALJ for further evaluation of Ruybal's diabetic retinopathy because the ALJ did not adequately address the nature and severity of this condition prior to the date of disability determined by the ALJ. (AR 113-18.)

On February 26, 2013, the ALJ held a second disability hearing. (AR 31-57.) On June 11, 2013, the ALJ again issued a partially favorable decision, this time determining that Ruybal was

not disabled prior to June 20, 2012, but that he was disabled beginning on that date and continued to be disabled through the date of decision. (AR 24.) Ruybal filed another appeal with the Appeals Council, but the Council declined his request, making the ALJ's June 11, 2013, decision the final decision of the Social Security Administration ("SSA"). (AR 1-6.)

Ruybal sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing (Doc. 18). The Commissioner of the SSA ("Commissioner") responded (Doc. 20), and Ruybal filed a reply (Doc. 21). After having read and considered the entire record and the relevant law, I grant Ruybal's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). The Court may reverse and remand if the ALJ has failed "to apply the

correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 404.1520(a)(4) (2014). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. § 404.1520(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's residual functional capacity ("RFC"). *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. § 404.1520(e). The ALJ then determines the physical and mental demands of the claimant's past relevant work in phase two of the fourth step and, in the third phase, compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. § 404.1520(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). If the claimant cannot return to his past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

**FACTUAL BACKGROUND**

Ruybal is a fifty-two-year-old man with a tenth-grade education, who was in special education classes for reading and English. (AR 244, 303.) Ruybal worked as a security alarm installer from 1994-1998, 2002-2003, and 2005-2006. (AR 300.) He also worked as a brake line technician in 1993, a cashier in 1997, a cabinet installer from 1999-2000, an installer of vacuums and sounds systems from 2002-2003, a custodian in 2004, a part-time valet from 2008-2009, and a part-time alarm technician in 2009. (*Id.*; AR 292.) Ruybal stopped working as a security alarm installer in 2006 due to pain in his legs and back, trouble climbing ladders, and problems getting into attics and crawl spaces. (AR 299.)

The first record in the AR dates back to March 15, 2002, when Ruybal visited Eye Associates of New Mexico ("Eye Associates") for a diabetic eye exam. (AR 453.) Ruybal stated that his visual acuity fluctuated, more so at night. (*Id.*) Mi-Kyoung Song, M.D., did not find diabetic retinopathy at that time. (*Id.*)

On January 16, 2006, Ruybal saw Ashok Reddy, M.D., at Eye Associates. (AR 450.) Dr. Reddy diagnosed Ruybal with proliferative diabetic retinopathy ("PDR") in the left eye and background diabetic retinopathy ("BDR") in the right eye. (*Id.*)

Ruybal went to Presbyterian Hospital's emergency room for vomiting and chest pain on February 19, 2007. (AR 413.) He had not been taking his diabetes medications since October 2006 due to the cost. (AR 414.) Ruybal's glucose level was 454 mg/dL (AR 423, 431), and he was assessed with poorly controlled diabetes mellitus (AR 415). Susan Smith, CFNP, prescribed NovoLog 70/30 Insulin and glyburide 2.5 mg. (AR 424.)

On March 2, 2007, Ruybal went to First Choice Community Healthcare ("First Choice"), complaining of a "pinched nerve." (AR 368.) He was assessed with uncontrolled diabetes

mellitus, neuropathy, uncontrolled gastroesophageal reflux disease ("GERD"), and depression. (*Id.*) Ruybal refused counseling. (*Id.*)

Ruybal's sister, Donna Torres, completed a Third Party Function Report on March 31, 2007. (AR 308-15.) She stated that Ruybal lived with her. (AR 308.) On a daily basis, Ruybal got up, cleaned himself up, took medication, and had a hard time walking. (*Id.*) Torres stated that Ruybal can no longer work for long periods of time, and his sleep is affected by his legs hurting and tingling. (AR 309.) He could not lift heavy items and could only walk about a block before needing to rest. (AR 313.) Ruybal had no problems with personal care, doing his own laundry, cleaning his room, doing some mowing, driving a car, and shopping for essentials for about an hour once every one to two weeks. (AR 309-11.) However, he needed reminders to take his medicine, he could not cook because of pain in his legs, he had low energy and a hard time concentrating, and he had difficulties managing money. (AR 310-12.) Torres stated that Ruybal spent time with family and had a friend over once in a while, but he stayed home a lot. (AR 312.)

Ruybal returned to First Choice on April 3, 2007, for a follow up on his back pain. (AR 367.) Ruybal admitted to occasionally using marijuana. (*Id.*) He had increased hypertension. (*Id.*) The physician had a long discussion with Ruybal about diet and insulin. (*Id.*)

On May 19, 2007, Greg McCarthy, M.D., performed a consultative examination of Ruybal. (AR 371-75.) Ruybal informed Dr. McCarthy that his diabetes affected his eyes through blurred vision and that he had burning sensations and numbness in his hands and feet that affected his ability to climb ladders and get into crawl spaces. (AR 372, 374.) Ruybal also stated that he could dress and feed himself, lift ten pounds occasionally, stand for ten to twenty-five minutes, walk for fifteen to twenty minutes, sit for thirty to forty minutes, drive a car, and do

most household chores for short periods. (AR 373.) His medications include NovoLog 70/30, lisinopril, fluoxetine, cyclobenzaprine, ibuprofen, and potassium. (*Id.*)

Upon physical examination, Dr. McCarthy found that Ruybal moved from an exam table and chair with little difficulty. (AR 374.) His gait, grip strength, and range of motion were normal. (*Id.*) However, Ruybal had difficulty walking on his heels and toes, squatting, and performing the heel-to-toe walk. (*Id.*) Ruybal's neurologic ankle reflexes were decreased bilaterally, and he had decreased sensation to light touch in his feet. (*Id.*) Dr. McCarthy noted clubbing of the hands and fingers and a partial amputation of the right thumb. (*Id.*)

Dr. McCarthy found that Ruybal had hypertension and insulin-dependent diabetes, both of which were poorly controlled. (AR 375.) Ruybal also had diabetic neuropathy of the lower extremities. (*Id.*) Dr. McCarthy found that Ruybal could walk short distances on even terrain; stand, walk, and sit with adequate rest breaks in an eight-hour day; and occasionally lift ten pounds. (*Id.*) He would have some difficulties with repetitive stooping, squatting, and bending, but no difficulties with reaching, grasping and pulling with his arms. (*Id.*) Dr. McCarthy found no visual or communicative limitations. (*Id.*)

On June 5, 2007, N.D. Nickerson, M.D., performed a Physical RFC Assessment. (AR 377-84.) Dr. Nickerson found that Ruybal could occasionally lift or carry fifty pounds and frequently lift or carry twenty-five pounds; stand or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and push or pull without limitation, except as indicated by lifting or carrying restrictions. (AR 378.) Dr. Nickerson found no postural or manipulative limitations, but did find that Ruybal had limited visual far acuity and depth perception. (AR 380.) On March 30, 2008, Janice Kando, M.D., affirmed this RFC in a Case

Analysis. (AR 455.) Dr. Kando noted that Ruybal may be limited in his ability to work with small objects and read small print. (*Id.*)

Ruybal attended follow up visits at First Choice on June 8 and July 13, 2007. (AR 385-87.) On July 15, 2007, Paula Hughson, M.D., completed a Psychiatric Evaluation for New Mexico Disability Determination Services. (AR 389-92.) Ruybal complained, "I got my diabetes and problems with my legs and problems with my back. They did a nerve test a few weeks ago. I feel depressed because I have no money and I feel I have nothing to show for my life." (AR 389.) Dr. Hughson found Ruybal to have a dejected, collapsed body posture. (AR 391.) Ruybal walked slowly and complained of pain in his lower back. (*Id.*) His affect was restricted, and he appeared severely depressed and despondent. (*Id.*) Ruybal admitted to some suicidal ideation, which he combatted through prayer. (*Id.*) His attention was somewhat decreased. (*Id.*) Dr. Hughson determined that Ruybal's depression appeared to be directly related to his frustration with his physical problems, including chronic back pain, that have significantly restricted his ability to work. (*Id.*) Dr. Hughson found that most work limitations would be related to physical conditions, but that Ruybal could be expected to experience moderate difficulties understanding and remembering basic instructions, moderate to significant difficulties concentrating and persisting at tasks of basic work, and moderate difficulties getting along with supervisors, co-workers, and the public. (*Id.*) She diagnosed Ruybal with recurrent and severe major depressive disorder, in connection with physical illness; alcohol abuse, not a significant problem at present; and mild cannibus abuse; with a GAF of 50.[1] (AR 392.)

---

[1] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005) (hereafter "DSM-IV"). A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.* Although the fifth edition of

On July 16, 2007, Scott R. Walker, M.D., performed a Psychiatric Review Technique (AR 394-407) and Mental RFC Assessment (AR 408-11). Dr. Walker found that Ruybal had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (AR 404.) Dr. Walker determined that Ruybal was moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (AR 408-09.) Elizabeth Chiang, M.D., affirmed these findings in a Case Analysis on reconsideration on December 21, 2007. (AR 433.)

On August 21, 2007, Ruybal saw Michael L. Dimonaco, D.O., at Eye Associates. (AR 446-47.) Dr. Dimonaco diagnosed Ruybal with moderate, vision-threatening PDR and moderate BDR. (AR 446.) Ruybal's corrected vision was 20/20. (AR 447.) Dr. Dimonaco referred Ruybal for a retinal consult with Dr. Reddy. (AR 446.)

On August 29, 2007, Dr. Reddy found Ruybal to have PDR. (AR 442.) Ruybal complained of blurry vision in both eyes for three years, with difficulties seeing street signs. (*Id.*)

---

the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, Ruybal's mental health providers used this scoring method.

However, his near vision was good. (*Id.*) Ruybal had floaters but denied flashes. (*Id.*) Dr. Reddy performed pan-retinal photocoagulation on August 31, September 11, September 28, October 9, November 6, and December 4, 2007, and January 8, 2008. (AR 435-41.)

On five occasions in July 2008 and three occasions in October 2008, Ruybal went to the University of New Mexico Hospital ("UNMH") for various abscesses. (AR 466-69; 484-96.) Ruybal tested positive for Methicillin-resistant Staphylococcus aureus. (AR 496.) He was prescribed acetaminophen-oxycodone, cephalexin, and Bactrim DS. (AR 492.)

On July 18, 2008, Ruybal went to First Choice for a follow up and to discuss his lipid panel. (AR 665.) His blood sugars were averaging in the two hundreds mg/dL, with the highest measurements in the four hundreds mg/dL. (*Id.*) Ruybal was not taking fluoxetine for depression due to insufficient funds. (*Id.*) His cholesterol was high. (*Id.*)

On September 16, 2008, Ruybal saw Arup Das, M.D., at UNMH for blurry vision. (AR 481.) Dr. Das noted that Ruybal's blood sugar was in the three hundreds mg/dL and that Ruybal had poor eating and drinking habits. (*Id.*) One week later, on September 23, 2008, Dr. Das diagnosed Ruybal with vitreous hemorrhage, traction retinal detachment, and diabetic retinopathy in the left eye. (AR 479.) Dr. Das performed a pars plana vitrectomy, membrane peeling endolaser photocoagulation ("PPV") of the left eye on October 6, 2008. (AR 476.) By October 14, 2008, Ruybal's vision was still blurry but had cleared up some. (AR 474.)

In a Disability Report dated November 3, 2007, Ruybal wrote that his eyes were blurry, his pain was worse, he experienced neuropathy, and he was slower getting things done. (AR 319-24.)

On November 20, 2008, Angela Romero, M.D., Ruybal's primary care provider at First Choice, wrote a letter stating that Ruybal had a history of uncontrolled diabetes, hyperlipidemia,

peripheral neuropathy, insomnia, hypertension, retinopathy, and depression. (AR 459.) He had many stresses in his life, including child support and a probation officer. (*Id.*)

On December 2, 2008, Ruybal visited UNMH for another follow-up on his PPV. (AR 464.) His visual acuity had been resolving but was now "very blurred." (*Id.*) On December 29, 2008, Ruybal was still experiencing blurry vision, and he complained of seeing black lines and dots. (*Id.*)

In a Disability Report dated February 19, 2009, Ruybal stated that his pain was worse, his vision was blurry, he experienced neuropathy, and he was slower getting things done. (AR 328-34.)

Ruybal was admitted to UNMH from March 2 to March 6, 2009, after complaining of a neck and shoulder infection and out-of-control diabetes. (AR 608.) Ruybal tested positive for MRSA in a neck abscess. (AR 510.) He also had mild hypoinflation of the lungs, without acute cardiopulmonary disease detected. (AR 667.) He was prescribed Metformin for hyperglycemia caused by poor diet control. (AR 510.) Ruybal stated that he had been out of insulin for a week because of financial difficulties. (AR 608.) At UNMH, Ruybal received IV antibiotics and glucose control. (AR 684.)

On March 24, 2009, Ruybal went for a follow up for his vision at UNMH. (AR 557.) He described explosions in his left eye, floaters, and visual acuity that comes and goes. (*Id.*) Ruybal stated that his new glasses did not help much. (*Id.*) On April 28, 2009, Dr. Das diagnosed Ruybal with chronic vitreous hemorrhage, traction retinal detachment of the right eye. (AR 508.)

On May 12, 2009, Ruybal presented to First Choice for an infected toenail, from which a malodorous black pus was draining. (AR 661.) First Choice referred him to UNMH, where he

was found to have osteomyelitis of the first distal phalanx, with surrounding cellulitis. (AR 669.) Ruybal's great right toe was amputated on May 19, 2009. (AR 506.)

On May 24, 2009, Ruybal returned to UNMH for abdominal pain. (AR 523.) He was found to have urinary retention problems. (AR 526.)

On June 1, 2009, Kristen Biggs, M.D., performed a debridement of the right first toe amputation site due to non-healing of the site. (AR 591.) During the procedure, Dr. Biggs found extensive fibrinous exudate and some necrotic skin edges at the site of the amputation. (AR 592.) Upon completion of the procedure, Ruybal had "very good" vascular supply to the wound bed. (*Id.*) On June 12, 2009, John Pickens, M.D., of UNMH, wrote a letter stating that Ruybal had complications from peripheral vascular disease and diabetes and could not perform any physical duties until his amputation site healed and he rehabilitated his leg. (AR 560.) Before and after the debridement, he received wound care and wound VAC therapy three times a week. (*See* AR 591, 660.)

On June 16, 2009, Ruybal was admitted to UNMH for an altered mental status, likely mania, and hyperkalemia. (AR 584.) Ruybal had been talking to "dragons." (AR 576.) His sister stated that he was responding to auditory and visual hallucinations and tried to light the house on fire. (AR 576, 584.) He was easily irritated and wanted to get into a fight. (AR 576.) At UNMH, he mumbled intermittently and laughed inappropriately while lying in bed. (*Id.*) However, upon evaluation by psychiatry, Ruybal's suicide risk was found to be low. (AR 573.)

Ruybal went to First Choice for a follow up on June 23, 2009. (AR 659.) Ruybal's sister stated that Ruybal still seemed to be having episodes of delirium. (*Id.*) Ruybal was also having trouble sleeping, and he had started on Flomax for urinary retention problems. (*Id.*) Ruybal expressed willingness to try over-the-counter sleep medications. (*Id.*) The same day, Ruybal also

visited UNMH for an ischemic right foot and right lower leg pain. (AR 776-77.) Dr. Pickens noted that Ruybal was not completely compliant with weight bearing to his right low extremity, but he appeared to have an appropriately healing wound. (AR 776.) Ruybal was scheduled for a June 26, 2009, diagnostic angiogram with possible endovascular interventions to increase his blood flow to the right foot. (AR 777.)

On June 26, 2009, John Marek, M.D., performed an angiography of the legs. (AR 813.) Ruybal followed up with First Choice on July 7, 2009, and with Dr. Marek at UNMH on July 9, 2009. (AR 658, 779.) Dr. Marek noted that the amputation site was somewhat slow to heal, though Ruybal had been relatively noncompliant with wound care. (AR 779.) The angiogram showed moderate tibial artery disease with anterior tibial peroneal and mild posterior tibial disease on the right, along with some intrinsic vascular disease in his right distal posterior tibial artery. (*Id.*) Dr. Marek determined that better compliant wound care and weekly wound clinic visits would be the best option for healing the wound. (*Id.*)

On July 27, 2009, Dr. Das performed a PPV on Ruybal's right eye to address the chronic vitreous hemorrhage and traction retinal detachment. (AR 811.) His visual acuity was still slightly blurry as of September 1, 2009. (AR 1098.)

Ruybal saw Jeffrey Jobe, M.D., at UNMH on August 7, 2009, for an ischemic right foot, poor healing of his right great toe amputation and a new lesion on his right fourth toe. (AR 771-72.) He followed up with First Choice on August 10, 2009. (AR 657.) On August 12, 2009, Dr. Marek performed the following operations: 1) Right lower extremity angiography; 2) 2.5 mm and 2.0 mm balloon angioplasties in the lower right leg; and 3) open amputation of the right fourth toe. (AR 808.)

On September 8, 2009, Ruybal saw Jessica Knight, CNP, for right foot swelling and pain. (AR 1094.) He had a fever and chills, and his right foot was too painful to walk on. (*Id.*) Ruybal was started on IV antibiotics and pain medications. (AR 1095.) The following day, Dr. Marek performed an open transmetatarsal amputation on Ruybal's right foot for diabetic right foot infection. (AR 1090.)

Dr. Biggs performed a debridement and revision of the right transmetatarsal amputation on September 14, 2009. (AR 1088.) During the procedure, Dr. Biggs found residual infection involving the dorsal aspect of the right foot. (*Id.*) There was good blood supply to the forefoot. (*Id.*)

On October 2, 2009, Ruybal saw David Reyes, M.D., at UNMH, complaining of increased pain and drainage at the amputation site. (AR 883.) Ruybal fell and injured the foot, with pain 6/10. (*Id.*) Ruybal remained at UNMH until October 19, 2009, for IV antibiotics and management of the wound site. (AR 885, 1169.) On October 16, 2009, Dr. Reyes completed a non-physical Medical Assessment of Ability To Do Work-Related Activities. (AR 767.) Dr. Reyes concluded that Ruybal faced marked difficulties with maintaining physical effort for long periods without a need to decrease activity or pace, or to rest intermittently. (*Id.*) Dr. Reyes also found that Ruybal suffered from moderate difficulties maintaining attention and concentration for extended periods (i.e., 2-hour segments), performing activities within a schedule, maintaining regular attendance and being punctual with customary tolerance, completing a normal workday and workweek without interruptions from pain or fatigue-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) Dr. Reyes noted that his opinions were based on Ruybal's acute condition during hospitalization and that his long-term prognosis might improve or worsen. (*Id.*)

Dr. Reyes also completed physical assessments on October 16, 2009. (AR 768-69.) Dr. Reyes found that Ruybal could stand or walk for less than two hours in an eight-hour workday; sit for less than six hours in an eight-hour workday; push or pull with limitations in the upper and lower extremities; reach with limitations in all directions; and lift less than ten pounds occasionally and frequently. (AR 768-69.) He also found that Ruybal's peripheral neuropathy was minimal at that time but would most likely worsen. (AR 768.) The long-term prognosis of his acute condition could improve or deteriorate. (AR 768-69.)

On October 20, 2009, Ruybal was transferred to Las Palomas rehabilitation center. (AR 824.) Upon entry, Ruybal required assistance with bed mobility, transfer, or ambulation, with his mobility "very limited." (*Id.*; AR 828.) He had poor balance and was unable to ambulate. (AR 1013.) Ruybal rated his pain on October 21, 2009, as eight out of ten. (*Id.*) On October 27, 2009, Ruybal stated that he could not read regular print, though he could see large print. (AR 842, 978.)

On October 28, 2009, Ruybal fell using his crutches and hurt his foot. (AR 874.) However, his wound was healing. (*Id.*) The following day, on October 29, 2009, Ruybal received an Occupational Therapy Evaluation from Las Palomas. (AR 976.) He required maximum assistance with wheelchair mobility/management, total assistance with housekeeping, and assistance with safety awareness. (*Id.*) Ruybal's activity tolerance was poor, and his strength was 4/5 in the upper extremities and at least 3/5 in the lower extremities. (*Id.*; AR 1012.) As of November 4, 2009, Ruybal required assistance with dressing and bathing. (AR 931, 933.) He was at risk for falls related to decreased strength, mobility, vision problems, and use of narcotic pain medications and antidepressants. (AR 936.)

On November 12, 2009, Ruybal received a skin graft to his right metatarsal amputation wound at UNMH. (AR 1137.) He was advised to continue outpatient physical therapy. (AR 1138.) On November 17, 2009, Ruybal reported to Dr. Das that he had foggy vision that was worse with bright lights. (AR 1140.)

The next and final records in the AR are from December 28, 2011, and January 5, 2012, when Ruybal established care with Romero Family Medicine. (AR 1173-75.)

### HEARING TESTIMONY

Because Ruybal seeks review of the ALJ's second decision, I summarize the latter disability hearing that took place on February 26, 2013. (*See* AR 31-57.) Ruybal and a Vocational Expert ("VE") testified, and Ruybal was represented by an attorney. (*See id.*)

The ALJ noted that she was assessing Ruybal's case on remand and that she would reconsider the entire period, from Ruybal's alleged disability onset date to the date of the hearing. (AR 33.) The ALJ introduced the VE, who was testifying by telephone due to inclement weather. (AR 34.) Ruybal's attorney objected to the VE's appearance by telephone instead of in person, which the ALJ noted. (*Id.*)

Ruybal testified that he worked temporarily as a part-time valet since his alleged onset date, quitting because of his vision and neuropathy in his legs. (AR 35-36.) He stated that he had trouble running to get cars from the parking lot, and he could not park cars properly due to his eyesight. (*Id.*) His legs hurt, and his blood sugar was out of balance. (AR 37-38.)

Ruybal testified that eye surgery in 2009 helped his vision a "little bit," but that he still had some blurriness with his vision. (AR 36.) The ALJ noted that Ruybal was not wearing glasses at the hearing. (AR 37.) Ruybal stated that he broke his glasses a few weeks prior, but that he hardly wore them anyway. (*Id.*)

15

Ruybal confirmed that he takes prescription medication for his diabetes, high blood pressure, nausea, and depression. (AR 38-40.) Ruybal testified that he had been on depression medications since 1997 but that he did not attend counseling for depression. (AR 40.)

Ruybal testified that too much standing triggers pain, and he cannot lift more than ten pounds. (AR 40-41.) He also stated that he cannot bend his legs or squat, and he has lost much of his balance since the amputation of a few of his toes in 2009. (AR 41.) Ruybal affirmed that while he tries to stay as active as possible, he cannot stay on his feet for long. (*Id.*) Ruybal used a cane at the hearing. (*Id.*)

Ruybal testified that he lives with his adult son. (AR 42.) His son cooks for Ruybal and does most of the driving and grocery shopping, though Ruybal occasionally goes out for necessities. (*Id.*) Ruybal has troubles bathing and dressing due to poor balance. (*Id.*) Ruybal does laundry and occasionally takes out the trash, but does not do yard work. (AR 43.) For fun, Ruybal watches television and sports and plays cards, though the cards are blurry, and he must examine them close up. (*Id.*) With his glasses, Ruybal can read the newspaper close up. (AR 43-44.)

Ruybal testified that his mother passed away in March 2012, and he had been mourning since then. (AR 44.) Prior to his mother's death, Ruybal was trying to cope with his medical problems. (AR 45.) He was doing rehabilitation in June 2012 after having a toe amputated on his left foot, and Ruybal testified that he had prostate surgery in November 2012. (AR 45-46.)

The ALJ noted that she did not have records of the toe amputation on the left foot. (AR 46.) She stated that the Appeals Council had vacated the whole decision, so she would leave the record open for forty-five days so that Ruybal's attorney could supplement the record. (AR 46-47.)

16

Ruybal's attorney then asked Ruybal some questions. (AR 47-52.) Ruybal testified that he only worked part-time as a valet because he could not function as well. (AR 47.) He took the job as a valet because it was lighter work than previous work as a custodian, prior to his disability application date. (AR 47-48.) However, Ruybal had problems with back pain when he had to occasionally lift wheelchairs and help people get out of their cars. (AR 48.) Ruybal's employer informed him that he was too slow picking up cars, he was not parking cars correctly, and his breaks to rest and check his blood sugar were becoming a problem. (AR 48-50.) Ruybal described some memory problems when his blood sugars were high. (AR 49.) Ruybal missed about two days of work per month due to diabetes-related problems. (*Id.*)

Ruybal testified that he used to work in alarm installation, and that he would not be able to program alarm systems anymore due to his vision or climb ladders. (AR 50.) Ruybal stated that he could not live on his own. (AR 51.) From Ruybal's application date in 2007 to 2009, the ALJ's original date of disability onset, his family bought groceries, and performed all heavy lifting and heavy maintenance. (AR 52.)

The ALJ next questioned the VE. (AR 52-55.) The ALJ asked the VE to assume a person of Ruybal's age, education, and work history, who is limited to sedentary work, has reasonable near vision, distance vision is intermittently blurry, and can perform simple, routine tasks. (AR 54.) The VE testified that such a person could not perform Ruybal's previous work. (*Id.*) However, such a person could work as a charge account clerk, clearance cutter, or cuff folder. (AR 54-55.)

Ruybal's attorney then questioned the VE. (AR 55-56.) Ruybal's attorney asked whether such a person would be precluded from the jobs listed if he was limited to less than ten pounds in occasional and frequent lifting, could only stand less than two hours, would have to alternate

between sitting and standing, and could only occasionally stoop and crouch and never kneel or crawl. (AR 55.) The VE testified that such a person would not be able to maintain employment. (AR 56.) If this hypothetical person had moderately restricted attention and concentration such that he would be off task twenty percent of the day, that would also foreclose employment. (*Id.*)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

On August 14, 2012, the Appeals Council remanded the ALJ's original decision. (AR 113-18.) The Council vacated the hearing decision on the basis of the substantial evidence provision, 20 C.F.R. § 404.970. (AR 115.) Specifically, the Council found that the ALJ did not adequately address the nature and severity of Ruybal's diabetic retinopathy prior to the disability onset date determined by the ALJ. (*Id.*) For example, the Council noted that Ruybal underwent a pars plana vitrectomy, membrane peeling endolaser photocoagulation of the left eye on October 8, 2008, and that at a follow-up visit on January 27, 2009, Ruybal only had a corrected acuity of 20/100 in his right eye and 20/400 in his left eye. (*Id.*) Ruybal's ophthalmologist noted that he had vision field loss, his prognosis was poor, and he was diagnosed with PDR in both eyes with macular ischemia. (*Id.*)

The Council provided several directions to the ALJ upon remand: 1) Obtain additional evidence about Ruybal's physical impairments, including, if warranted and available, consultative examinations or medical source statements regarding what Ruybal can do despite his diabetic retinopathy; 2) further evaluate Ruybal's subjective complaints and provide a rationale for such evaluation; 3) give further consideration to Ruybal's maximum RFC during the entire period at issue and provide a rationale with specific references to evidence of record in support of such limitations, while evaluating treating and nontreating source opinions pursuant to 20 C.F.R.  § 404.1527 and requesting additional evidence or clarification from such sources if

18

appropriate; 4) if necessary, obtain evidence from a medical expert to clarify whether Ruybal's impairments meet or equal the severity of an impairment in the Listing of Impairments; and 5) if warranted by the expanded record, retain a VE to clarify Ruybal's occupational base. (AR 116.)

On remand, the ALJ first noted that Ruybal's attorney did not submit additional medical evidence after the hearing. (AR 13.) The ALJ acknowledged that the case was remanded to further evaluate Ruybal's diabetic retinopathy. (*Id.*) She then reviewed Ruybal's application for benefits according to the sequential evaluation process. (AR 13-24.) At the first step, the ALJ found that Ruybal had not engaged in substantial gainful activity since December 8, 2006, his alleged onset date. (AR 15.) Then, at the second step, the ALJ concluded that Ruybal suffers from the severe impairments of type II diabetes mellitus, diabetic retinopathy, diabetic neuropathy, status post right transmetatarsal amputation, and depression. (AR 16.) At step three, the ALJ found that Ruybal's combination of severe impairments did not equal one of the listed impairments. (*Id.*) The ALJ noted that she gave little weight to the opinion of Dr. Hughson because her assessments "appear[ed] [to be] based primarily on her opinion." (AR 18.) The ALJ also found that the record as a whole did not reflect the social limitations suggested by Dr. Hughson. (*Id.*)

The ALJ then determined Ruybal's RFC, finding that Ruybal could perform, since December 8, 2006, sedentary work in which he is limited to "simple[,] routine tasks that require reasonable near vision, although distance vision is intermittently blurry." (*Id.*)

The ALJ summarized Ruybal's testimony. (AR 19-20.) The ALJ found that Ruybal's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Ruybal's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible. (AR 20.) The ALJ noted that she took into

19

consideration Ruybal's alleged confusion when his blood sugar levels are too high. (*Id.*) The ALJ explained that, combined with the possible effects of depression, she limited Ruybal to simple, routine tasks. (*Id.*) However, the ALJ concluded that because Ruybal displayed continued noncompliance with his diabetes treatment regimen, it was reasonable to assume the Ruybal's symptoms were not as frequent and severe as he alleged. (*Id.*)

With regard to Ruybal's vision, the ALJ stated that Ruybal's visual acuity never reached the point where he was unable to function independently or drive a car. (*Id.*) Further, she noted that the blurriness was most likely linked to control of his blood sugar levels. (*Id.*) The ALJ referenced Ruybal's testimony and evidence from the AR to support her conclusion. (*Id.*)

As to Ruybal's complaints of neuropathic pain in his lower extremities and difficulty balancing following his right transmetatarsal amputation in September 2009, the ALJ stated that she took these alleged symptoms into account by limiting Ruybal to sedentary work. (*Id.*) According to the ALJ, sedentary work is consistent with Ruybal's testimony that he could lift ten pounds and engage in non-strenuous household chores. (*Id.*) The ALJ also noted that Dr. Romero's notes from December 2011 and January 2012 did not mention use of a cane. (AR 21.) Further, the ALJ wrote that the medical records established that Ruybal would have required a cane to ambulate from May 2009, when he developed an infection in his right foot, to about mid-February 2010, three months after his final procedure on the right foot—a period that did not last for a continuous period of twelve or more months. (*Id.*)

The ALJ determined that while there was insufficient evidence that Ruybal's work as a valet and security alarm technician in 2008-2009 constituted substantial gainful activity, the fact that he performed these strenuous jobs part-time suggests that he could perform sedentary work full-time. (*Id.*)

20

The ALJ accorded "great weight" to the opinion of state agency consultant Dr. McCarthy, who performed an examination of Ruybal on May 19, 2007, to the extent that his opinion is consistent with Ruybal's performance of sedentary work. (*Id.*) The ALJ accorded "little weight" to the June 12, 2009, opinion of Dr. Pickens and the October 16, 2009, medical source statement from Dr. Reyes because both indicated that their opinions addressed only Ruybal's limitations immediately before and after amputations of his right toes and that his conditions and abilities would improve upon healing of the wounds. (AR 22.) Finally, the ALJ also accorded "little weight" to a Function Report completed by Ruybal's sister, Donna Torres, on March 31, 2007, because her statements were not consistent with other evidence. (*Id.*)

The ALJ concluded at step four that Ruybal could not perform past relevant work since December 8, 2006. (*Id.*) At step five, the ALJ noted that Ruybal's age category changed on June 20, 2012, from a younger individual (age 45-49) to an individual closely approaching advanced age. (*Id.*) The ALJ next found that it was irrelevant whether Ruybal possessed transferability of job skills prior to June 20, 2012, and that Ruybal did not have transferrable job skills beginning on June 20, 2012. (*Id.*) The ALJ determined that, prior to June 20, 2012, considering Ruybal's age, education, work experience, and RFC, Ruybal could make a successful adjustment to work that existed in significant numbers in the national economy, such as the work of a charge account clerk, clearance cutter, or cuff folder. (AR 23.) On the other hand, the ALJ concluded that, beginning on June 20, 2012, considering Ruybal's age, education, work experience, and RFC, there were no jobs existing in significant numbers in the national economy that Ruybal could perform. (*Id.*) The ALJ therefore found that Ruybal was not disabled prior to June 20, 2012, but that he became disabled on that date and continued to be disabled through the date of decision. (AR 24.)

Ruybal appealed the ALJ's second decision to the Appeals Council, but the Council found that Ruybal's reasons for disagreeing with the hearing outcome did not provide a basis for changing the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-6.)

DISCUSSION

Ruybal makes several arguments for reversing and remanding this case. Ruybal first argues that the ALJ's RFC finding that he could perform sedentary work prior to June 2012 was contrary to the evidence and the law. Second, Ruybal argues that the ALJ erred by failing to consider whether the factors requiring a finding of disability as of his fiftieth birthday applied prior to that date, thus making the onset date arbitrary ("Borderline Age Error"). Third, Ruybal argues that the VE testimony was inconsistent with the Dictionary of Occupational Titles and unreliable with respect to the number of jobs.

## I.       RFC Finding

Ruybal makes four specific claims of error with respect to the ALJ's RFC finding that he could perform sedentary work prior to June 2012, and he also argues that the RFC is not supported by substantial evidence. Ruybal first argues that the ALJ's RFC finding does not describe the maximum amount of close vision work Ruybal can perform. Second, Ruybal contends that the ALJ improperly weighed the evidence in determining his RFC. Third, Ruybal argues that the ALJ erred by improperly weighing the opinion of Dr. Hughson; by failing to explain why she omitted a limitation in the RFC on his ability to get along with supervisors, co-workers, and the public; and by failing to discuss a moderate limitation in understanding and remembering "basic instructions" and a moderate-to-significant limitation in concentration and

persistence, even on "tasks of basic work." Finally, Ruybal argues that the ALJ erred by failing to order a medical source statement.

A.  Vision Impairment

Ruybal argues that the ALJ's RFC finding that he could perform work that requires "reasonable near vision" is meaningless and unsupported by the evidence. He contends that a proper RFC assessment must "describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." (Doc. 18 at 6 (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996)).)[2] Ruybal further cites authority requiring that, when a claimant has a visual impairment, the ALJ must consider resulting limitations affecting other work-related abilities. (Doc. 18 at 6 n.4 (citing 20 C.F.R. § 404.1545(d)).) Ruybal then reviews the evidence from the record relating to his vision, including his PDR diagnoses, blurry vision, pan-retinal photocoagulation, Dr. Kando's finding that Ruybal may be limited in his ability to work with small objects and read small print, Dr. Nickerson's finding that Ruybal has limited far acuity and depth perception, retinal detachments in both eyes, Ruybal's 2009 statement that he could see large but not regular print, and his difficulties parking cars as a valet.

Ruybal also argues that the ALJ's finding that his "blurriness is most likely linked to control of his blood sugar levels" is an improper substitution by the ALJ of her own opinion for that of Dr. Das. Finally, Ruybal asserts that the ALJ failed to, as instructed by the Appeals Council, obtain additional evidence concerning his physical impairments.

---

[2] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

The Commissioner argues that there was substantial evidence to support the ALJ's decision for several reasons and that, rather than the ALJ's RFC finding being meaningless, the finding could be construed as no significant limitation in near vision. First, the Commissioner points out that the ALJ noted in her decision that Dr. Das found no visual field loss. The Commissioner states that Dr. McCarthy noted the absence of evidence of retinopathy in 2007, and that at times prior to June 2012, his vision was "not as bad." (Doc. 20 at 13.) The Commissioner argues that some of Ruybal's eye surgeries were somewhat helpful in improving his vision, and glasses were also somewhat helpful. The Commissioner notes that Dr. Romero found in August 2011 that his eyes appeared normal and that Ruybal testified in February 2013 that he could read a newspaper if wearing eyeglasses. Finally, the Commissioner points out that Dr. Nickerson found only moderate visual limitations without corrective lenses, Dr. Kando's opinion was equivocal because she said that Ruybal "may" have limitations, and Dr. Kando's opinion shortly followed certain eye procedures performed by Dr. Reddy.

SSR 96-8p requires that both exertional and nonexertional capacity be expressed in terms of work-related functions. 1996 WL 374184, at *6. "[I]n assessing RFC for an individual with a visual impairment, the adjudicator must consider the individual's residual capacity to perform such work-related functions as working with large or small objects, following instructions, or avoiding ordinary hazards in the workplace." *Id.* at *6. "[T]he [ALJ] must . . . describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7; *see also* 20 C.F.R. § 404.1545(d). The Tenth Circuit has remanded a case to the SSA where the ALJ described an RFC with "limited vision," but did not define the functional consequences of the claimant's limitation. *Norris v. Apfel*, 215 F.3d 1337, 2000 WL 504882, at *2 (10th Cir. 2000) (unpublished table decision). In the present

case, it is impossible for the Court to determine what exactly the ALJ intended by "reasonable near vision." Nor can the Court review any resulting work-related functional limitations because the ALJ did not discuss them. Therefore, I remand this case to the SSA to clarify Ruybal's vision limitations and discuss resulting work-related functional limitations in accordance with SSR 96-8p and 20 C.F.R. § 404.1545(d).

In addition, nowhere does the medical evidence of record reflect that Ruybal's visual "blurriness is most likely linked to control of his blood sugar levels." (AR 20.) Upon remand, the ALJ shall not hypothesize the cause of a symptom, but must instead reach determinations based on substantial evidence.

Finally, the Appeals Council instructed the ALJ to obtain additional evidence concerning Ruybal's physical impairments. (AR 115-16.) The Appeals Council stated that the ALJ did not adequately address the nature and severity of Ruybal's diabetic retinopathy prior to May 19, 2009, the ALJ's original determined disability onset date. (AR 115.) As such, the Appeals Council advised that such additional evidence might include consultative examinations, medical source statements, or further clarification or evidence from treating or nontreating sources. (AR 116.) The only new medical evidence added to the AR from the first decision to the second are office records from Ruybal's primary physician at Romero Family Medicine. (AR 1173-78.) These records only show that Ruybal established care with the clinic and received treatment for a urinary tract infection and benign hypertrophy of the prostate. (AR 1174.) The AR reflects that the ALJ did not, as ordered by the Appeals Council, obtain additional evidence regarding Ruybal's diabetic retinopathy. Upon remand, the ALJ shall follow the instructions from the Appeals Council about collecting additional evidence.

B. Weighing of Evidence

Ruybal argues that the ALJ did not properly weigh the evidence in determining that Ruybal could perform the exertional requirements of sedentary work. His first claim of error is that the ALJ erred in affording great weight to Dr. McCarthy's May 2007 consultative examination report. (AR 371-75.) Specifically, Ruybal argues that the ALJ failed to determine whether Dr. McCarthy's opinion in 2007 withstood later medical evidence, including neuropathy and amputations, which resulted from progressing diabetes.

The Commissioner argues that the ALJ's accordance of great weight to Dr. McCarthy's opinion was supported by favorable objective medical findings on later dates. The Commissioner references positive physical responses to Ruybal's 2009 amputations and angioplasty and some improvements to Ruybal's vision following surgeries.

As cited by Ruybal,

the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including the other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist.

SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). I am already remanding this case in part for further development of the record, as previously instructed by the Appeals Council. As such, I do not decide whether Dr. McCarthy's opinion is supported by later evidence. However, I instruct the ALJ to consider the supportability of Dr. McCarthy's opinion with respect to later medical evidence.

Next, Ruybal argues that the ALJ erred by according "little weight" to the opinions of Drs. Reyes and Pickens because their opinions addressed a limited period of time in 2009, when Ruybal underwent multiple amputations. Instead, Ruybal argues, the ALJ should have followed up with these doctors, pursuant to instructions by the Appeals Council. The Commissioner argues, at least in the context of Dr. Reyes, that the opinions were based on a "period of acute illness and treatment therefor." (Doc. 20 at 17.)

The ALJ accorded the opinions of Drs. Reyes and Pickens little weight with respect to Ruybal's RFC. As previously noted, Dr. Pickens indicated that Ruybal could not perform physical duties until his amputation wound healed and he had completed rehabilitation. (AR 560.) Dr. Reyes evaluated Ruybal shortly after his right metatarsal amputation, while he was receiving IV antibiotic treatment and other care at UNMH. He specifically noted that his opinion was "based on acute condition during hospitalization. [The] [l]ong-term prognosis may improve or be worse." (AR 767.)

Ruybal has provided no authority to show that the ALJ erred by failing to accord greater weight to the opinions of Drs. Reyes and Pickens, which were explicitly limited to brief snapshots of time in 2009, in determining Ruybal's RFC. Further, the ALJ must "assess [a claimant's] residual functional capacity based on all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). I therefore do not find error in the ALJ's assessment of the opinions of Drs. Reyes and Pickens.

Ruybal also argues that the ALJ failed to follow up with Drs. Reyes and Pickens, directly contrary to instructions from the Appeals Council. This argument is unpersuasive, as the Appeals Council directed the ALJ to, "[a]s appropriate, . . . request the treating and nontreating source[s] to provide additional evidence and/or further clarification of the opinion and medical source

statements about what the claimant can still do despite the impairments." (AR 116.) The Appeals Council did not require the ALJ to follow up with specific physicians, so I do not find that the ALJ's failure to follow up with Drs. Reyes and Pickens was directly contrary to the Appeals Council's instructions.

Next, Ruybal argues that the ALJ failed to cite to any evidence that Ruybal was unable to work from May 2009 through "about mid-February 2010, three months after his final procedure on the right foot," thus not achieving twelve continuous months during which he was unable to work. *See* 20 C.F.R. § 404.1505(a). Based on a review of record, there is no medical evidence to indicate that Ruybal was able to work beginning in mid-February 2010. Without more, the mid-February date appears arbitrary. Upon remand, the ALJ must explain any decisions that Ruybal could work on certain dates but not others.

Ruybal also argues that the ALJ committed reversible error by failing to discuss Ruybal's statements to his medical providers that he had difficulties affording his diabetes medications. Ruybal cites 20 C.F.R. § 404.1530, which includes various examples of acceptable reasons for failure to follow prescribed treatment. Financial difficulties are not listed, though are not excluded. *See id.* However, the Commissioner cites to SSR 82-59, which discusses justifiable causes for failure to follow prescribed treatment, where such treatment could be expected to restore a claimant's ability to work. 1982 WL 31384, at *4 (Jan. 1, 1982). When a claimant cannot afford prescribed treatment, "[a]ll possible resources (e.g., clinics, charitable and public assistance agencies, etc.), must be explored. Contacts with such resources and the claimant's financial circumstances must be documented." *Id.* There is no evidence in the record that Ruybal explored alternative resources to obtain his medications. As such, I do not find that the ALJ erred in failing to discuss Ruybal's inability to afford his diabetes medications.

Finally, Ruybal argues that the ALJ erred by relying on part-time work attempts that did not constitute substantial gainful activity to find that Ruybal could perform full-time, sedentary work. As noted by the Commissioner, "[e]ven if the work [a claimant] ha[s] done was not substantial gainful activity, it may show that [the claimant] [is] able to do more work than [he or she] actually did." 20 C.F.R. § 404.1571. The ALJ properly referenced work Ruybal performed as a valet in 2008 to 2009 and as an alarm technician in 2009. (AR 21.) Although, as Ruybal points out, the ALJ also referenced in her discussion a 2009 hospital admission form on which Ruybal stated that his occupation was "alarm technician," even though he was no longer working, I do not find that the ALJ erred. The ALJ properly cited the work he performed, with the correct time periods and descriptions of the work.

C.   <u>Mental Impairment</u>

Ruybal makes several arguments as to errors in the ALJ's treatment of Dr. Hughson's opinion. First, he argues that the ALJ erred by according "limited weight" to Dr. Hughson's opinion because it was "based primarily on her opinion." (Doc. 18 at 16; AR 18.) The Commissioner does not directly respond to this alleged error, instead listing evidence from the AR that the Commissioner contends provides substantial evidence to support the ALJ's decision. (Doc. 20 at 18-23.)

The ALJ must not substitute her own medical judgment for that of Dr. Hughson. *See Winfrey*, 92 F.3d at 1022. Further, "a psychological opinion may rest either on observed signs and symptoms or on psychological tests." *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). A psychological opinion may also rest in part on a claimant's subjective statements. *Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. 2005) (unpublished). In weighing a medical source opinion, the ALJ must consider the factors set out in 20 C.F.R. § 404.1527(c), not

discount a medical opinion for being an "opinion." On remand, the ALJ shall evaluate Dr. Hughson's opinion according to the factors in 20 C.F.R. § 404.1527(c).

Because the ALJ's reconsideration of Dr. Hughson's opinion on remand may change the RFC, I do not address Ruybal's argument that the ALJ erred by failing to explain why she omitted a limitation in the RFC on his ability to get along with supervisors, co-workers, and the public; a moderate limitation in understanding and remembering "basic instructions;" and a moderate to significant limitation in concentration and persistence, even on "tasks of basic work."

D. Ordering a Medical Source Statement

Ruybal argues that the ALJ failed to develop the record by obtaining additional consultative examinations or medical source statements about what he can still do despite his impairments. I have already determined that the ALJ must obtain additional evidence with respect to Ruybal's diabetic retinopathy, so I do not address this argument separately. Upon remand, the ALJ shall, as instructed by the Appeals Council, provide a rationale with specific references to evidence of record in support of the revisited RFC.

**II.     Borderline Age Error, VE Testimony, & Substantial Evidence**

Because I have found specific errors at step four of the sequential evaluation process, I do not evaluate generally Ruybal's argument that the RFC is not supported by substantial evidence. Nor do I proceed to Ruybal's alleged errors at step five. The ALJ's evaluation at step five will likely be different due to her reevaluation, as instructed, at step four.

CONCLUSION

I grant the motion to remand this case so that the ALJ may clarify Ruybal's vision limitations and discuss resultant work-related functional limitations, obtain additional evidence

regarding Ruybal's diabetic retinopathy, reach conclusions supported by explanations and without mere hypothesizing, and reweigh the opinion of Dr. Hughson according to the factors in 20 C.F.R. § 404.1527(c). Accordingly, this case is remanded to the SSA for further proceedings consistent with this opinion.

       IT IS SO ORDERED.


                                       William P. Lynch
                                       United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.